# Magee *against* Magee.

An acknowledgment such as will relieve a demand from the operation of the statute of limitations, must be so precise and distinct in its extent and form as to preclude hesitation about the meaning of the party making it.

ERROR to the district court of *Allegheny* county.

Cornelius Darrah, administrator of Samuel Magee against William Pentland, administrator of Christopher Magee. This was an action of assumpsit, in which the defendant pleaded " *non assumpsit infra sex annos*," and the only question which arose in the cause, was whether the acknowledgments made by the defendant's intestate in his life-time, were such as to relieve the plaintiff's demand from the operation of the statute of limitations. The testimony on this point and also the opinion of the court below are transcribed into the opinion of this court.

[Magee v. Magee.]

*Black* and *Biddle*, for plaintiff in error, cited 1 *Wheat. Selw.* 142; 6 *Watts* 220; 1 *Wheat.* 360; 3 *Wash. C. C. Rep.* 407; 1 *Peters* 360.

*Wilkins*, for defendant in error, cited 3 *Penn. Rep.* 179; 6 *Watts* 45, 219.

The opinion of the court was delivered by

HOUSTON, J.—I premise, that after judicial decisions in England, the statute of limitations on simple contracts, had become useless or worse. These decisions, having been too implicitly followed in this country, the courts in this state, began more than thirty years ago, to retrace their steps. Perhaps it might have been better at once to have gone back to the original decisions, and the plain meaning of the act and said, it embraced all simple contracts more than six years old, but that the debtor might nevertheless create a new debt by an express promise to pay a specific sum. A regard for opinions and usage in common affairs, founded on former decisions, however, induced those who preceded us to proceed gradually.

I shall not trace the progress of the decisions by citing every case, but refer only to a few of the last.

It is not sufficient to take a case out of the statute, that it should be proved and acknowledged that a debt was originally due. The acknowledgment must go to the fact that it is still due. Gallagher *v.* Milligan, 3 *Penn. Rep.* 177. In Hogan *v.* Bear, 5 *Watts* 111, in a verbal discussion before a justice, the defendant acknowledged the plaintiff's demand to be still due, but also asserted that another person ought to pay it, and ended in pleading the statute; it was held not to be such an admission as deprived the defendant of the protection of the act. The whole opinion of the chief justice in that case is referred to; it is not easy to epitomize it, without lessening its force. " To avoid the uncertainty and insensible encroachments on the statute that would ensue, did we attempt to shape our course as to this statute by former decisions, we may require the *acknowledgment of the demand and debt to be so precise and distinct in its extent and form as to preclude hesitation.*" Birghaus *v.* Calhoun, 6 *Watts* 220.

To these I shall add a case from the supreme court of the United States. Though it is on the statute of Kentucky, yet that statute, as ours is, is founded on the British, and differs only in making five years the period of limitation instead of six years. The case also shows that the supreme court of that state are governed in their decisions by the same views which have been adopted here.

The case of Bell *et al. v.* Morrison *et al.*, 1 *Peters* 387, is the one referred to. The amount in dispute was large. The counsel was most able—and it was carried to the highest court; the reasoning of the court is not easily answered. Bell & Co. had furnished

[Magee v. Magee.]

iron of various descriptions to a large amount to the defendants, a company for manufacturing salt; at the end of five years a large debt remained due. There was proof, by witnesses and from their own letters, of admissions that the debt was unpaid to some amount, and there was proof that within a year of the time of commencing the suit, Morrison said, "he would settle the account if he had the books;" again, "I know we are owing you and I am anxious it should be settled." That at length Morrison said, "I am growing old and wish to be done with it, and proposed to give the plaintiff seven thousand dollars and close the business." That no account or papers were produced or shown; both the witnesses understood the conversation related to the balance of an account for iron and castings furnished. The circuit court decided, that the proof did not take the case out of the statute of limitations; this was affirmed in the supreme court. The court say, (page 360) "parol evidence may be offered of confessions (a species of evidence, as has been often observed, is hard to disprove and easy to fabricate) applicable to such remote times as may have no means to trace the nature, extent or origin of the claim, and thus open the way to the most oppressive charges. If we proceed one step further and admit that loose and general expressions, from which a probable or possible inference may be deduced of the acknowledgment of a debt, by a court or jury, that as the language of some cases has been, that any admission of an unsettled account, without any specification of the amount or balance, and however undeterminate and casual, are yet sufficient to take the case out of the statute of limitations, and let in evidence tending to establish any debt however large, or at whatever distance of time, it is easy to perceive, that the wholesome objects of the statute may be in a great measure defeated and the statute virtually repealed;" and again in page 362, "If the expression be vague, equivocal, and indeterminate leading to no certain conclusion, but at best to probable inference, which may affect different minds in different ways, we think they ought not to go to the jury as evidence of a new promise to revive the cause of action. Any other course would open out the mischiefs against which the statute was intended to guard innocent persons, and expose them to the danger of being entrapped in ceaseless conversations, and betrayed by perjuries."

The court then admit that some just claims may be lost, but say that many unfounded recoveries will be prevented. The statute must have the effect intended, and no plaintiff can lose except one who neglects its provisions.

The court then come to the particulars—"and the words of Morrison, 'we know we are owing you,'—but he had not the books and could not settle—and they say (page 366), "if this evidence stood alone, it would be too loose to prove anything. The language would be equally true, whether the debt was one dollar or 10,000 dollars. It is indispensable that the plaintiff should go fur-

[Magee v. Magee.]

ther and establish, by independent evidence, the amount of the balance due him, before there can arise any promise to pay it as a subsisting debt. The acknowledgment of the party then does not constitute the sole ground of the new promise; it requires new intrinsic aid before it can possess legal certainty. Now if this be so, does it not let in the whole mischief intended to be guarded against by the statute?—does it not enable the party to bring forward stale documents after a lapse of time when the proper evidence of the real state of the transaction cannot be produced?—does it not tend to encourage perjury by removing the bar upon slight acknowledgments of an indeterminate nature?—can an admission that something is due or some balance owing, be justly construed into a promise to pay any debt or balance which the party may prove before a jury?"

It then admits that an express promise to pay an express sum, or to pay, perhaps, whatever may be due on a settlement, may dispense with the statute: and after referring to some Kentucky decisions, proceeds to consider the offer to pay 7000 dollars to close the business; and this is disposed of, as an offer of compromise made to end the business, and they apply the principle, that such an offer does not bind unless accepted. I should have doubted this part of the case, and the application of this principle to it, and so it seems did that court, for they give another reason. The partnership of Morrison & Co. had been dissolved some years before this offer, and though each of the partners had made acknowledgments, Morrison alone had made this offer, and whatever effect it might have had if he had been sole defendant, yet clearly it would not bind those who had been, but were not then his partners; and the suit was against all.

I have cited this case more at large because of the great weight of the court, then composed of very distinguished men—both on account of their learning and experience, and because it comes to the same conclusion as this court, as expressed by the chief justice before cited; it requires " the acknowledgment of *the demand to be so precise and distinct in its extent and form as to preclude hesitation.*"

It has been the practice in this state, and sanctioned by this court, to receive testimony of indebtedness, at a period long before six years prior to commencing a suit, and if nothing is proved to take the case out of the statute, to direct the jury to disregard the evidence given. In cases where the defendant has pleaded *non assumpsit infra sex annos,* proof of indebtedness prior to that time, may be merely misspending the time of the court, or it may be involving the court with the jury. As it seems to be settled that whether testimony will, if believed, exempt a case from the operation of the statute, it would be in many respects better and more consistent with principle, to require this proof, which is to defeat the operation of the statute in the first instance, and if decided by the court

[Magee v. Magee.]

to be insufficient, to stop all further testimony. This case was however tried on the old practice.

The first witness knew nothing prior to 1827; he says, " Samuel was a good dyer—can not say whether Samuel worked regularly or was a steady hand—he was intemperate—can not say how often I saw him at work—from six to nine dollars were wages for a man who worked steady all the week; dyeing is an important part of the business, and he and all the witnesses stated, that when begun it must be constantly attended to, from 26 to 33 hours.

The next witness commenced his knowledge in 1829—" It was a rule with Samuel to keep sober during the time of colouring—a hand always with him—sometimes took a frolic after colouring—never considered him a habitual drunkard—has been perfectly steady three months at a time—his frolic would last a day or a week at a time—do not remember of more than a week." The last witness stated, that he acted as foreman in weighing out work; was employed in pulling and cutting fur—sometimes when drinking would work at these things.

The next witness commenced in 1826—same as the former—never neglected in colouring—attentive and skilful at that—coloured once in 10 days or once in two weeks—witness as a journeyman made sometimes eight and 10 dollars a week, sometimes more and sometimes less.

All these and the next witness stated, that Christopher paid five dollars a week to Samuel's family—this regularly—that Mrs Magee was prudent and industrious, and the money always sent to her—had heard Samuel complain that the money was not given to him—that Christopher also laid in the coal for Samuel's family.

All the witnesses also proved that trimming the hats was done by Samuel's wife and daughters—trimming price one dollar per dozen. No witness knew of any business done by or any support of the family except through Christopher Magee.

The next witness was C. L. Magee, son of Samuel, and who had assigned his interest to the administrator, for his mother and sisters; he became an apprentice in 1822, and so continued till 1829—and he says his father worked for his uncle as far back as he can remember—he says the wages formerly were seven, eight or nine dollars per week—he did not earn that all the time—he was irregular.

I shall copy the rest of his testimony.—" In the spring of 1831, Christopher Magee and my father were at me to go into partnership—he took an inventory of the stock, it amounted to something over 2200 dollars. My uncle observed that nearly cancelled his debt with my father. At that time he had concluded to go out of business in a year; he said the 2200 dollars would about cancel his debt to my father, but on the partnership books the amount of stock was placed to my uncle's credit—and the amount due me as journeyman for wages went to my credit—275 dollars—*what induced me*

[Magee v. Magee.]

*to go into partnership was to get this for my father*—it was the inducement held out to me, that my uncle would go out at the end of the year, and leave the whole to me. In 1836 when my father was sick on his deathbed, my uncle and myself came there together; my father then directed my uncle to pay what was due from him, and also what was due by the firm to my mother; we both stated we would do it without any hesitation. My father died the 10th of June 1836. In the winter of 1839, my uncle Christopher and myself were about dissolving: his wife objected to his going out of business; he spoke of what he owed my mother; I talked of giving him an endorser for what I would fall in debt; he said there was no use of getting an endorser, for this debt, which was due my mother from him and from the firm, would eat up all the stock that was in it. I said he had better go on to settle up the account; he said he would, but never did, and his partnership was not dissolved till his death dissolved it, July 5, 1839. In the winter of 1839, the whole amount of the stock in the shop was about 4000 dollars—the whole amount of the assets of the firm was from 12 to 15,000 dollars, when we took the inventory after his death."

On cross-examination he said, " I offered Mr Thompson as my endorser; he got angry when I spoke of an endorser. When I went into partnership I put in 275 dollars. Nothing said as to the amount at that time: my father remarked he wanted what was due to him to go to my mother; [I understand this to refer to what passed immediately before his father's death in 1836.] The inventory had been taken in the fall, and in February 1839 the conversation took place as to my mother. Not certain there was 4000 dollars worth of stock; my impression is it was to that amount. He knew the amount of stock; had the inventory; was in ill health in spring of 1839—no other person present when this last conversation took place. The family got five dollars a week regular, and coal. Know of no other thing they got. My grandmother gave them a house and sometimes clothing to the girls. Do not know if uncle gave them orders on stores except once an order in favor of my father for a coat. In 1831 uncle stated he kept back the rest of the money from father for the use of the family; I can recollect of my father working there from 1819."

Plaintiff's counsel read statement of what plaintiff claimed.

The court charged " that it was for the jury to put a construction on parol testimony; that an acknowledgment, to be sufficient to take a case out of the statute, must be an acknowledgment that the debt is a subsisting debt which the defendant intends and promises to pay; that a debt barred by the statute, is a sufficient consideration to found a promise to pay; that if the jury believe the conversations testified to in 1831, 1836, and 1839, that Christopher Magee acted as trustee for his brother, retained of his wages what was not needed for the support of his family, and admitted in 1831, that over 2200 dollars were retained in his hands for the use of his

x.—Q

[Magee v. Magee.]

brother's family; in 1836 promised to apply it for the use of his brother's widow, and in 1839 spoke of a large sum as still in his hands due to his brother's family.    The court are of opinion, that the acknowledgments, if believed, are sufficient to take the case out of the statute.

The error assigned is in this opinion.

It will be readily admitted that, some years ago, this would have been considered as law.    I have already stated that we had been gradually approaching the true meaning and intention of the statute. The case cited from 6 *Watts*, would seem not to have occurred to the district court.    The danger there stated of relapsing, by insensible degrees, into a construction which would destroy all useful effect of the statute, was in the hurry of a trial overlooked; and the conversations in 1831, 1836, and 1839, are considered as more intimately connected and relating more directly to the same distinct matter, than the common course of business and understanding of men will warrant.    Admitting, what is not very clear, that the conversation in 1831 was so distinct an acknowledgment of the demand, in its extent and form, as to preclude hesitation, what is the conversation in 1836?    When Samuel was on his death-bed, expected never to rise, he requests his brother to pay what was due him to his widow; and Christopher, without hesitation, says he will.    The one side treat this as a solemn engagement to a dying man.    The other side say it is all consistent with a full conviction in the mind of Christopher that he owed nothing.    The counsel of plaintiff below gave a high character of Christopher—a highminded, honest, kind-hearted man.    Waiving all this, would any brother, in such circumstances, have told the dying man, "you are raving—I owe you nothing."    Was it an acknowledgment precise as to any extent of demand?    Did it admit 20 or 2000 dollars to be due?    If all that passed has been reduced to writing, would Samuel's words have imparted a bequest of all that was due to his widow? or a request to Christopher to acknowledge a debt?    Or if so, what debt and to what amount?

In 1839 the stock was about 4000 dollars.    On a talk of dissolving and the nephew buying out the uncle, Christopher says, the debt due by himself and by the firm to the widow of Samuel, would eat up all the stock.    Did he mean all his own share of the stock, which was all he had to sell?    What was that share in 1839?    One-half or seven-eighths?    How much was due from himself, and how much from the firm?

Is it in the reasonable course of business, that a large debt from a man in good circumstances and full business, shall remain the same for five, nay for eight years, and not be mentioned?    If the declaration that what he and the firm owed, rendered it unnecessary for the nephew to pay him any thing, amounts to an admission that what is alleged to have been due in 1831 is still due in 1839, the statute of limitations would be in most cases a dead letter.    It is not

[Magee v. Magee.]

. so strong as " we know we are owing you;" and an offer to pay a sum. It is not precise nor distinct as to the amount. The fair import of the charge is, and so the jury would understand it, that the conversations of 1836 and 1839 relate to the precise sum stated by the witness to have been mentioned in 1831. We think this an *inference*, and not a very distinct one—and that a distinct acknowledgment of indebtedness will not and cannot, without destroying the usefulness of the statute, go back and revive old accounts long barred by the statute. Such conversations and acknowledgments must appear to have related to such stale demand. The party to be barred must understand that they are the subject-matter in hand. Admissions in terms so vague, that he who makes them supposes they relate to recent and small matters, are not to revive old accounts, or old settlements, which have not been mentioned for years, and which law, and the reason and course of business among men will suppose were not mentioned, because they were in some way settled and extinguished. .

We decided that an account, or simple contract-debt, offered as a set-off, is affected and barred by the statute, as much as if it were sued upon by a plaintiff. If a loose indefinite acknowledgment, or void promise of a defendant, will take all claims which can be proved out of the operation of the statute, and there is no corresponding promise by the plaintiff to admit defendant's old accounts and claims, we see at a glance that the most glaring injustice may, nay, must often follow.

Judgment reversed, and a *venire facias de novo* awarded.